## Laughlin Brothers' Company, Incorporated, Appellant, *v.* Philadelphia & Reading Railway Company.

*Railroads—Carriers—Common carriers—Delivery—Negligence—Perishable goods—Custom.*

Where a railroad company permits consignees of produce to sell the produce to retailers from cars in a yard known as a market yard, but, under a long-established custom, known to all parties, does not permit any one consignee to have more than three cars at a time in the market yard, and other cars of the consignees are kept in another yard until a car is emptied and released in the market yard, a consignee cannot recover damages for a loss resulting from a deterioration of produce in the cars in the storage yard, where the railroad company is in no way negligent, and the delay in delivering cars to the market yard is due to the inability or the neglect of the consignee to empty and release cars in time to prevent the deterioration.

Argued March 22, 1909. Appeal, No. 357, Jan. T., 1908, by plaintiff, from order of C. P. No. 2, Phila. Co., Dec. T., 1906, No. 3,078, refusing to take off nonsuit in case of Laughlin Brothers Company, Incorporated, v. Philadelphia & Reading Railway Company. Before MITCHELL, C. J., FELL, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Assumpsit for breach of a contract of a common carrier. Before WILTBANK, J.

The opinion of the Supreme Court states the case.

At the trial the court entered a compulsory nonsuit which it subsequently refused to take off.

*Error assigned* was refusal to take off nonsuit.

*George P. Rich,* for appellant.—So long as anything remains to be done by the carrier to complete the transportation, to wit, to put the goods where they can be delivered to the owner, or where the owner can get them, the liability as a carrier continues: Shenk v. Phila. Steam Propeller Co., 60 Pa. 109; National Line Steamship Co. v. Smart, 107 Pa. 492; McMasters v. R. R. Co., 69 Pa. 374; Independence Mills Co. v. Burlington, etc., Ry. Co., 72 Iowa, 535 (34 N. W. Repr. 320).

The plaintiff, having given evidence that its onions, which arrived here in good condition, were delivered to it by the carrier in a damaged condition, had cast the burden of proof upon the carrier to prove that this was not due to its negligence; which was sufficient to carry the case to the jury: Buck v. R. R. Co., 150 Pa. 170; Schaeffer v. R. R. Co., 168 Pa. 209.

If the ruling of the court below is correct, it follows that the carrier can, by its own mere usage or practice, relieve itself from the consequences of its own negligence and utter disregard of its duties and liabilities, although it could not have done so by express contract with the shippers.

A common carrier cannot by contract relieve itself from the consequences of its own negligence. It is against public policy: Willock v. R. R. Co., 166 Pa. 184; Ruppel v. Ry. Co., 167 Pa. 166; Hughes v. R. R. Co., 202 Pa. 222; Eckert v. R. R. Co., 211 Pa. 267; Grogan v. Express Co., 114 Pa. 523; Schaeffer v. R. R. Co., 168 Pa. 209.

*John G. Lamb,* for appellee.—The custom was a reasonable one: McMasters v. Penna. R. R. Co., 69 Pa. 374; Adams v. Pittsburg Ins. Co., 95 Pa. 348; Carter v. Coal Co., 77 Pa. 286;

Allam v. R. R. Co., 183 Pa. 174; The Viola, 90 Fed. Repr. 750; Randall v. Sprague, 74 Fed. Repr. 247; Bartlett v. Cargo of Lumber, 41 Fed. Repr. 890; Sloan v. R. R. Co., 126 N. C. 487 (36 S. E. Repr. 21).

The appellees are not presumed to be experts in the care of onions, or to know that they would not keep as well stored in a car as they might in a warehouse other than the cars themselves.

They were compulsory bailees of the onions, bound only to such reasonable care as a prudent and honest man would take of property of which he has become the involuntary custodian: The Bobolink, 6 Sawyer, 146.

OPINION BY MR. JUSTICE POTTER, October 11, 1909:

This was an action of assumpsit, in which the plaintiff sought to recover damages from the defendant company, for alleged breaches of contract as a common carrier. At the trial, judgment of nonsuit was entered, and from the refusal to set it aside, the plaintiff has appealed.

It appears from the evidence that the plaintiff was engaged in raising and shipping onions. At various times during the months of October and November, 1906, it shipped from Nappanee, Ind., to Philadelphia, Pa., over the road of the Philadelphia & Reading Railway Company, eleven car loads of onions, one consigned to J. S. Wright & Son, and ten to the shippers themselves. The bills of lading for seven of these cars contained instructions "to notify P. S. Scott, with privilege of inspection." Scott had purchased the onions, subject to examination upon arrival. The eleven cars arrived at Philadelphia between October 27 and November 14. It appears that the defendant company maintains a terminal yard at Erie avenue in which all cars loaded with produce are placed upon arrival, and immediate notice is given to parties interested. Admittedly, such notice was given in this case. There are no facilities for unloading at Erie avenue.

The company has another yard located at Second and Master streets known as the "delivery yard" or "potato yard." Here it delivers the produce to the consignees in the

cars, and the consignees are permitted to sell from the cars to their customers. This yard has become, therefore, a general market place for the sale of produce, chiefly potatoes, cabbages and onions, to the retail dealers. The capacity of the yard being limited to about 100 cars, the railway company will not deliver to one consignee more than two or three car loads at once, and if he has other cars consigned to him in the terminal yard, they will be held there, until the cars already delivered have been emptied. As soon as a car is empty, the consignee can have it removed and one of the waiting cars brought from the terminal yard and delivered in its place. This method of delivery has been customary for many years and is well known and recognized by the produce trade. It appears also that the railway company maintains other yards in Philadelphia at which delivery might have been made if desired, but Scott, the purchaser of the onions, wanted them delivered to the market yard at Second and Master streets. The loaded cars were permitted to remain in the terminal yards for various periods of from six to twenty-nine days, and when finally delivered at the market yard, the contents were considerably damaged.

There was evidence that the deterioration in the value of the onions, was caused by their being kept for so long a time in the cars; and plaintiff claimed that the delay was due to the refusal of the company to deliver them when demanded, and that the company was therefore responsible for the loss. The trial judge held that the evidence showed the custom in the trade, above noted, to deliver to consignees only at the delivery yard, Second and Master streets, and, on account of the limited space in that yard and its use as a market place, to deliver not more than three cars at a time to any one person or firm; and to deliver additional cars only as those first delivered were emptied and released. He held that plaintiff was bound by this custom, and as it appeared from the evidence that the company had been governed by such custom and had adhered to it in making their deliveries in this case, no negligence was shown on its part and there was no ground on which plaintiff could recover.

Both Scott and Wright, who handled the onions for plaintiff, testified to their knowledge of the custom, and Mr. Laughlin, president of the plaintiff company, testified that he knew that the yard at Second and Master streets, was a market, and that the contents of the cars sent there, were sold from the cars.

It further appears from the testimony, that both Wright and Scott had other car loads of produce, besides the onions shipped by plaintiffs, consigned to them, which were waiting in the company's storage yard for delivery, and that they ordered deliveries made from time to time from all the cars so consigned, and not alone from plaintiff's cars. Otherwise, the latter might have been delivered much sooner. For some reason, there was an unusual number of cars awaiting delivery in October and November, 1906, which caused a congestion in both yards.

A careful examination of the evidence in this case, has satisfied us that the judgment entered by the court below is entirely correct.

It was the duty of the consignees to unload the produce upon its arrival. Instead of promptly ordering the cars to be sent, three at a time, from the terminal yard to the market yard, and unloading them, and then sending for three more, and thus continuing, until all were unloaded, the consignees undertook to use the cars for storage purposes, until they could sell the onions to dealers. The railroad company permitted this to be done, as a favor to the consignees, but certainly such a concession is not to charge it with responsibility for the delay of the consignees in making sales. It is very clear that the delay in delivery was due to the failure of the consignees to designate the cars to be placed in the market yard, and not to any fault upon the part of the railway company. As we said above, under a well-recognized custom, the reasonableness of which is not questioned, the consignees were each entitled to have three cars at one time in the yard. If they had ordered plaintiffs' cars placed in the yard immediately upon the receipt of notice of their arrival, they might have received them all in the course of a few days. But in-

stead of doing so, they requested that other cars from other consignors, should be first delivered to them, and as a result, they were not entitled, under the custom which they admitted, to receive the plaintiff's cars until the others had been discharged and released. The company merely held the cars, subject to the order for delivery which would have been complied with as soon as the consignee had released the cars then in the yard.

The custom being admitted, and reasonable, was binding upon all parties, and must be regarded as part of the contract. Under the custom, the defendant company fully performed its duty, and it cannot be held responsible for the loss occasioned by the delay. The point is raised that the defendant was not bound to deliver until the bills of lading were produced. But there is testimony that the company practically waived this requirement. At any rate the refusal to deliver the cars in the present case was not based on the nonproduction of the bills of lading, but upon the fact that the consignees had all the time, three cars in the delivery yard, and, in order to entitle them to further deliveries, one or more of the cars then in the yard must first be emptied and released. The court below did not place its decision upon the ground of the nonproduction of the bills of lading, but upon the effect of this custom on the contract. We agree entirely with the view, and the conclusion of the trial judge.

The specifications of error are overruled, and the judgment is affirmed.